USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/11/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
                                 :

ZURICH INSURANCE COMPANY LTD. UK  :
BRANCH,                                 :

                               :

               Plaintiff,    :               1:24-cv-8342-GHW

                               :

          -against-      :          MEMORANDUM

                               :        OPINION & ORDER

XL SPECIALTY INSURANCE COMPANY, *et*  :
*al.*,                                 :

                   Defendants.  :

                               :

----------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

      Zurich Insurance Company Ltd. UK Branch ("Zurich") insured the directors and officers of

Woodman Maroc S.a.r.l. ("Woodman"), a company that managed a hotel in Morocco. Woodman

was a subsidiary of a joint venture that was 50% owned by Lehman Brothers Holdings Inc.

("Lehman"). XL Specialty Insurance Company ("XL Specialty") provided management insurance to

Lehman and its subsidiaries, as well as to Alvarez & Marsal Inc., which operated Lehman's assets

following its bankruptcy.

      In 2018, a criminal proceeding against Woodman was launched in Morocco. Zurich has

been funding the defense of its insureds in that action. The question presented in this motion is

whether XL Specialty must contribute to the cost of that defense. To answer that question, the

Court must determine the "pecking order" of the policies. Both Zurich's policy and XL Specialty's

policies contain "other insurance" provisions stating that they are excess to other policies. But XL

Specialty's policies expressly state that they are excess even over other excess policies, while Zurich's

policy does not. Because XL Specialty's policies expressly state that they are intended to be excess

over other excess policies, and Zurich's policy does not, Zurich's policy must be exhausted before XL Specialty must contribute to any defense. Therefore, XL Specialty's motion to dismiss is GRANTED.

## II.       BACKGROUND[1]

### A. The Parties

The parties in this action are diverse. Plaintiff Zurich Insurance Company Ltd. UK Branch is a public limited company incorporated in Switzerland, which operates in the United Kingdom through a branch registered in England and Wales. Compl. ¶ 7. Defendant XL Specialty Insurance Company is incorporated in Delaware and operates through an office in New York. *Id.* ¶ 8. Defendant Columbia Casualty Company ("Columbia") is incorporated in Illinois and operates through an office in New York. *Id.* ¶ 9.

### B. The Underlying Action

This declaratory judgment action is the result of a criminal prosecution that commenced half a world away, at a hotel in Morocco—the Royal Mansour Hotel (the "Hotel"). *Id.* ¶ 17. In 2006, at the beginning of the events that led to this dispute, the Hotel was owned by Compagnie Des Grands Hotels D'Afrique ("CGHA"). *Id.* The Hotel was managed by Woodman pursuant to a management agreement with CGHA. *Id.*

Woodman was a subsidiary of Starman Hotel Holdings LLC ("Starman Holdings"). *Id.* Starman Holdings was a joint venture between a subsidiary of Lehman Brothers Holdings Inc. ("Lehman") and a subsidiary of Starwood Capital Group Global, L.L.C. ("Starwood"). *Id.* ¶¶ 15–16. Through their respective subsidiaries, Lehman and Starwood each indirectly owned 50% of Starman

---

[1] The facts relevant to this motion are drawn from Plaintiff's amended complaint. Dkt. No. 50 ("Compl."), and are accepted as true for the purposes of this motion. *See, e.g.*, *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Holdings—and, through it, an indirect interest in the equity of Woodman. *Id.*

Lehman filed for bankruptcy in 2008. *Id.* ¶ 18. The bankruptcy court overseeing Lehman's bankruptcy appointed Alvarez & Marsal Inc. ("A&M") to serve as the corporate restructuring officer for Lehman's estate. *Id.* In that role, A&M managed Lehman's assets—including Lehman's interest in Starman Holdings, and, through Starman Holdings, Lehman's indirect interest in Woodman, the manager of the Hotel. *Id.*

Winding down Lehman's bankruptcy estate took a long time. Six years after Lehman filed for bankruptcy, in June 2014, Starman Holdings sold Woodman, together with other companies holding hotel assets, to a third-party ("Maquay"). *Id.* ¶ 20. The sale price was nominal, and only one month after buying Woodman, Maquay "put Woodman into voluntary liquidation." *Id.*

In October 2014, after Woodman was liquidated, CGHA—the owner of the Hotel— obtained possession of the Hotel. *Id.* ¶ 21. It appears that CGHA was not happy with what they found. After CGHA reassumed control over the Hotel, it asserted claims against Woodman, asserting that Woodman had failed to manage the Hotel properly, and that it had breached Woodman's agreement to manage the Hotel. *Id.* ¶ 22. In May 2015, CGHA obtained an "arbitration judgment" against Woodman to compensate CGHA for those breaches. *Id.*

Presumably because Woodman was unable to satisfy the judgment, CGHA pursued legal action against Woodman's parent companies. In April 2018, CGHA brought an action to enforce that arbitration judgment against Starman Holdings and Starwood Capital Group Global I LLC ("Starwood 1")[2] in the United States District Court for the District of Delaware (the "CGHA Action"). *Id.* ¶ 23.

CGHA also pursued criminal action in Morocco as a result of Woodman's alleged

---

[2] Starwood 1 owned or controlled SOF MER Holdings Sarl, an entity that owned 50% of Starman Holdings' shares. Compl. ¶ 16.

mismanagement of the Hotel (the "Moroccan Proceeding"). It was the Moroccan Proceeding that directly provoked this litigation. In March 2018, CGHA "lodged a criminal complaint with the Public Prosecutor in Morocco." *Id.* ¶ 24. The complaint was based on the same facts alleged in the CGHA Action. *Id.* In addition, it was "predicated on the actions of certain other entities ('Insured Entities') and certain individuals ('Insured Persons')." [3] *Id.*

In its Moroccan complaint, CGHA pointed to Woodman's alleged breaches of its management agreement with CGHA. *Id.* ¶ 25. CGHA alleged that the conduct of Woodman and other "various parties" was part of a criminal scheme "designed to injure it and the Hotel." *Id.* CGHA also alleged in its complaint that "the June 2014 sale of Woodman was part of a plan created to allow Woodman to evade any liability or responsibility resulting from failures in connection with the Management Agreement and a related arbitration." *Id.* ¶ 26. The criminal complaint claimed that Starwood I, together with the unnamed "Insured Entities" and "Insured Persons," "were all complicit in this operation which allegedly involved misappropriating funds from Woodman during the period in which it operated the Hotel which rendered it an empty shell, before it became bankrupt." *Id.* The complaint in the Moroccan Proceeding alleged that Woodman and the "Insured Persons" and "Insured Entities" committed a series of crimes, "including fraud, criminal bankruptcy and money laundering." *Id.* ¶ 27.

Zurich provided a directors and officers liability policy to Starman Holdings, the terms of which will be described in more detail below. *Id.* ¶ 28. Zurich has been paying for the defense of its insureds in connection with the Moroccan Proceeding, including the unnamed "Insured Persons"

---

[3] The complaint does not name the "Insured Persons" or the "Insured Entities." The complaint explains the rationale behind Plaintiff's decision not to reveal the identity of the "Insured Persons":

> The Moroccan Proceeding, a criminal proceeding, is currently pending and unresolved. As a result, Zurich, out of an abundance of caution, has not identified the Insured Persons by name in this publicly-filed pleading to avoid reputational harm to these individuals.

Compl. ¶ 32 n.3.

and "Insured Entities." *Id.* ¶ 32. It has paid no less than $4,171,635.99 in its defense to date. *Id.* Zurich requested that the defendants contribute to the cost of its defense, but they have refused. *Id.* ¶ 33. Zurich commenced this litigation to require the defendants to contribute to the cost of the defense of the Moroccan Proceeding.

### C. The Policies

Zurich's claim turns on an analysis of the "Other Insurance" provisions of three separate policies: First, a Directors and Officers Liability Insurance Policy issued by Zurich Insurance PLC UK Branch to Starman Holdings (the "Zurich Policy").[4] *Id.* ¶ 28; Dkt. No. 50-1 ("Zurich Policy Part 1"); Dkt. No. 50-2 ("Zurich Policy Part 2"). That policy was later transferred to Zurich. Compl. ¶ 28. Second, a Management Liability and Company Reimbursement Insurance Policy issued by XL Specialty to Lehman. *Id.* ¶ 37; Dkt. No. 50-3 (the "XL Lehman Policy"). And, third, an Organization and Management Liability Policy issued by XL Specialty to A&M. Compl. ¶ 44; Dkt. No. 50-4 (the "XL Alvarez Policy," and, together with the XL Lehman Policy, the "XL Policies"). XL Specialty has disclaimed any obligation to contribute to the defense of the Moroccan Proceeding because, it asserts, its policies are excess to the Zurich Policy, such that its coverage must be exhausted before XL Specialty is required to contribute to the cost of any defense.

#### 1. The Zurich Policy

The Zurich Policy was issued to Starman Holdings to cover the July 1, 2016 to June 30, 2017 policy period. Compl. ¶ 28. There is no dispute in this case that the Zurich Policy provides insurance coverage to the directors and officers of Starman Holdings and its subsidiaries. Zurich has made payments for the defense costs of its insureds. *Id.* ¶ 32; *see also* Zurich Policy Part 2 § 4.4.

The Zurich Policy contains an "Other Insurance" provision, which establishes the extent of

---

[4] Although Item 1 of the Schedule designates Starman Luxembourg Holdings SARL as the "Policyholder," Endorsement 5 states that the defined term "Policyholder" also means Starman Hotel Holdings LLC. Zurich Policy Part 2, Endorsement 5.

its obligation to pay claims that are covered by other insurance policies.  Zurich asserts that this

"Other Insurance" provision makes it excess to other insurance policies, including those issued by

XL Specialty to Lehman and A&M.  Zurich's "Other Insurance" provision reads as follows:

> If a Claim or Investigation under this Policy would, but for the existence of this Policy, be insured by any other valid and collectable:  (a) directors and officers liability or management liability policy or indemnity; (b) employment practices liability insurance policy; (c) general liability insurance policy; (d) pollution liability insurance policy; or (e) any other insurance which has a duty to defend such Claim or Investigation, the Insurer shall only be liable for any amount above that collectable under such other policy.
>
> When any other insurer has acknowledged under a duty to defend any Claim or Investigation that would otherwise be subject to coverage under this Policy, this Policy shall not respond or contribute to such Defence Costs to the extent of that other insurer's duty to defend.

Zurich Policy Part 2 § 10.4 (emphasis omitted).  While it provides that it will be excess to other

policies, the Zurich Policy language does not expressly provide that it will be excess to other policies

that have been designated as excess policies.

### 2.   The XL Lehman Policy

The XL Lehman Policy's "Other Insurance" provision is worded differently.  It provides

that it is intended to be excess to all other policies—including those that have been stated to be

excess.  Its "Other Insurance" provision reads in pertinent part as follows:

> If any Loss resulting from any Claim is insured under any other policy(ies), this Policy shall apply only to the extent Loss exceeds the amount paid under such other valid and collectible insurance whether such other insurance is stated to be primary, excess, contingent or otherwise, *unless such other insurance is written only as specific excess insurance over this Policy* in order to avoid duplication of payment of Claims.

XL Lehman Policy, New York Amendatory Endorsement, § 8 (deleting and replacing § VI(C)(1))

("Lehman Other Insurance Provision") (emphasis added).  As indicated in the highlighted language

above, the XL Lehman Policy is stated to be excess to all other excess policies "unless" the other

policy "is written only as specific excess insurance over this policy."  As described further below,

Zurich argues that its policy is such an "other insurance written only as specific insurance over" the

XL Lehman Policy.

The "Other Insurance" of the XL Lehman Policy also emphasizes that the policy is specifically excess to insurance that covers the officers of a "Joint Venture":

> All coverage under this Policy for Loss from Claims made against the Insured Persons while acting in their capacity as a director, officer, trustee, regent or governor of a Non-Profit Entity or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the Insured Persons of the Company, regardless of the name or title by which such position is designated, of a Joint Venture will be specifically excess of and will not contribute with, any other insurance or indemnification available to such Insured Person from such Non-Profit Entity or Joint Venture by reason of their service as such.

XL Lehman Policy, § VI(C)(2) (emphasis omitted).  A "Joint Venture" is defined as a corporation, of which the insured directly or indirectly "owns or controls at least thirty three percent (33%), but not more than fifty percent (50%) . . . ."  XL Lehman Policy § II(L)(1).  Starman Holdings, the parent company of Woodman, is alleged to be 50% owned by Lehman, and thus constitutes a "Joint Venture."

### 3.  The XL Alvarez Policy

The language of the XL Alvarez Policy's "Other Insurance" provision is identical to that of the XL Lehman Policy.  It reads as follows:

> If any Loss resulting from any Claim is insured under any other policy(ies), this Policy shall apply only to the extent Loss exceeds the amount paid under such other valid and collectible insurance whether such other insurance is stated to be primary, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over this Policy in order to avoid duplication of payment of Claims.

XL Alvarez Policy, New York Amendatory Endorsement, § 8 (deleting and replacing § VI(C)(1)) ("A&M Other Insurance Provision").  Section VI(C)(2) of the XL Alvarez Policy is identical to the parallel provision of the XL Lehman Policy.  *See* XL Lehman Policy § VI(C)(2); XL Alvarez Policy § VI(C)(2).

In addition, the XL Alvarez Policy contains a "Specified Other Insurance" Endorsement,

which states in relevant part:

> It is understood and agreed that the coverage provided under Insuring Agreements (A), (B) and (C) in this Policy will be specifically excess of, and will not contribute with any other valid and collectible insurance, Policies issued to Alvarez & Marsal Inc.'s Clients and any other policy or policies excess thereof issued to the Insured, and no coverage will be available under this Policy for Claims as to which such other insurance applies unless and until the limit or limits of liability of such other insurance shall have been completely exhausted by the payment of loss thereunder. . . .

XL Alvarez Policy, Specified Other Insurance Endorsement, § 1.

### D. Procedural History

Plaintiff first filed this action in the New York Supreme Court, County of New York, on October 3, 2024. Dkt. No. 1-1. The initial complaint named XL Specialty as a defendant, together with Columbia, CNA Financial Corporation, and CNA Insurance Company. *Id.* XL Specialty removed the action to this Court on November 1, 2024. Dkt. No. 1.

On January 3, 2025, Zurich dismissed its claims against CNA Financial Corporation and CNA Insurance Company, leaving XL Specialty and Columbia as the only remaining defendants in the case. Dkt. No. 32. Columbia filed an answer and crossclaim on the same day. Dkt. No. 35. XL Specialty filed a motion to dismiss the claims against it shortly thereafter. Dkt. Nos. 43–45.

In response to the motion to dismiss, Zurich filed an amended complaint against XL Specialty and Columbia. *See generally* Compl. The amended complaint seeks declaratory judgment regarding XL Specialty's obligations under the XL Lehman and XL Alvarez Policies with respect to the Moroccan Proceeding. Specifically, Zurich seeks a declaration that:

> i.     XL must provide coverage for the Insured Entities and Insured Persons under the XL Lehman Policy with respect to the Moroccan Proceeding;
>
> ii.    any coverage available to the Insured Entities and Insured Persons under the Zurich Policy with respect to the Moroccan Proceeding is excess over the coverage available to them under the XL Lehman Policy or, alternatively, the Zurich Policy and XL Lehman Policy provide such coverage on the same; and
>
> iii.   XL, under the XL Lehman Policy, must reimburse Plaintiff for all of the Amounts in Dispute that are covered under the XL Lehman Policy or,

> alternatively, for a portion of the Amounts in Dispute that are covered under
> the XL Lehman Policy, plus pre-judgment interest.

*Id.* ¶ 79.  Zurich seeks similar declarations with respect to the XL Alvarez Policy and the Columbia

Policy.  *Id.* ¶¶ 111, 142.  Zurich also asserts claims against each defendant for unjust enrichment and

equitable subrogation.  *Id.* ¶¶ 82–5, 114–27, 145–58.

On April 3, 2025, XL Specialty filed this motion to dismiss the amended complaint.  Dkt.

No. 64 (notice of motion); Dkt. No. 65 ("Mem.").  In its motion, XL Specialty argued that the XL

Policies are excess to the Zurich Policy and that, as a result, XL Specialty is not required to

contribute to the cost of defending the Moroccan Proceeding until the Zurich Policy has been

exhausted.  XL Specialty's argument relies on the ruling of *State Farm Fire & Cas. Co. v. LiMauro*, 65

N.Y.2d 369 (1985).  In that case, the New York Court of Appeals held:

> The rule to be distilled from these cases is that an insurance policy which purports to
> be excess coverage but contemplates contribution with other excess policies or does
> not by the language used negate that possibility must contribute ratably with a similar
> policy, but must be exhausted before a policy which expressly negates contribution
> with other carriers, or otherwise manifests that it is intended to be excess over other
> excess policies.

*LiMauro*, 65 N.Y.2d at 375–76.  This rule is often described as the "*LiMauro* Rule."

Applying the *LiMauro* Rule, XL Specialty argued that the XL Policies are excess to the

Zurich Policy because they do not, by their language, "contemplate[] contribution with other excess

policies."  *Id.* at 375.  XL Specialty pointed to the language in the XL Policies stating that "[coverage]

will be specifically excess of and will not contribute with, any other insurance."  Mem. at 14 (citing

XL Lehman Policy, § VI(C)); *id.* ("The XL Alvarez Policy employs similarly broad language.").  XL

Specialty argued that the Zurich Policy, by contrast, "wholly lacks [r]epudiation of [c]ontribution

[l]anguage" and "never explicitly holds itself out as excess to *other excess insurance policies*."  *Id.* at 14–15

(emphasis in original).  Rather, XL Specialty argues, the Zurich Policy only negates contribution

"with respect to payments made under other policies that have a duty to defend."  *Id.* at 15 (citing

Zurich Policy Part 2, § 10.4).

Moreover, XL Specialty argued that the conclusion that their policies were excess to Zurich's policy made sense given the structure of the insurance coverage. The Zurich Policy, XL Specialty argued, "is specific to Starman [Holdings], the entity directly responsible for the allegedly fraudulent Woodman entity." *Id.* at 18. By contrast, the XL Policies were issued at a much higher level in the corporate structure. Those policies extended coverage to Lehman, one of the indirect parents of Starman Holdings, and A&M, which later came to manage Lehman's assets. It made sense, XL Specialty argued, that the XL Policies would be structured to contribute only after the Zurich Policy was exhausted given that they were issued at a much higher level in the corporate structure and therefore covered a broader array of risks. *Id.*

XL Specialty advanced two arguments in support of its motion to dismiss Zurich's claims for unjust enrichment. First, because XL Specialty did not receive a "direct benefit from Zurich." *Id.* at 19. And second, because, it asserted, unjust enrichment is not available as a cause of action for "disputes between insurers . . . because the plaintiff-insurer provided a service to its insured, not to the defendant-insurer, even if the defendant-insurer indirectly benefited." *Id.* at 20. XL Specialty argued that Zurich's cause of action for equitable subrogation was not available "*as a matter of law* in disputes between co-insurers regarding the priority of coverage afforded." *Id.* at 22 (emphasis in original).

Zurich filed its opposition on May 1, 2025. Dkt. No. 66 ("Opp."). Zurich rightly accepted that the language of the XL Policies specifically designated policies as excess even to other excess policies. However, Zurich argued that the Zurich Policy fell into an exception drafted into the XL Policies. Specifically, Zurich pointed to the language from the XL Policies providing that they were excess to other insurance "*unless such other insurance is written only as specific excess insurance over this Policy* in order to avoid duplication of payment of Claims." Opp. at 1 (citing Compl. ¶¶ 69, 101 (citing XL

Lehman Policy, Endorsement 3; XL Alvarez Policy, Endorsement 7)).

Zurich argued that its policy was "written only as specific excess over" the XL Policies, and therefore fell within that exception. *Id.* at 1–2. To support that assertion, Zurich relied on Section 10.4 of the Zurich Policy, which states:

> If a Claim or Investigation under this Policy would, but for the existence of this Policy, be insured by any other valid and collectable: (a) directors and officers liability or management liability policy or indemnity; . . . the Insurer shall only be liable for any amount above that collectable under such other policy.

Zurich Policy Part 2, § 10.4 (emphasis omitted). Zurich contended that, because the XL Policies are management liability policies, Section 10.4 of the Zurich Policy is written to be specifically excess over those policies. Opp. at 7, 10–11.

Zurich also argued that its "Other Insurance" provision contains non-contributory language, which negates contribution with the XL Policies. In particular, Zurich relied on Section 10.4 of its policy, which states that Zurich "shall only be liable for any amount above that collectable under such other policy." *Id.* at 17 (quoting Zurich Policy Part 2, § 10.4). Thus, Zurich argued, it need not contribute with the Lehman Policies. *Id.* at 15–16. This argument requires that the Court accept Zurich's argument that the XL Policies are not excess to the Zurich Policy. For otherwise, no amount would presently be "collectable" under them.

In addition to its arguments based on the language of the contracts, Zurich argued that the structure of the transactions supports the conclusion that it should only pay under its policy after the XL Policies. Zurich argued that because the premiums for the policies insuring Lehman and A&M were greater than that for its policy, they must have been intended to cover more risk. Zurich argued that "courts . . . have considered policies' respective premium amounts when assessing priority of coverage." *Id.* at 12. While the dollar amounts of the premiums were redacted in the complaint to protect proprietary information, Zurich asserted that "it is indisputable that the premium paid for the Zurich Policy [was] exponentially lower than the premiums paid for the XL

Policies." *Id.* Specifically, "the premium amount in the XL Lehman Policy is 72.96 times greater than the premium in the Zurich [P]olicy and the premium amount in the XL [Alvarez] Policy is 17.35 times greater than the Zurich premium." *Id.* (emphasis omitted). Zurich argued that the fact that the Zurich Policy and the XL Policies covered overlapping risks, but that a smaller premium was paid for the Zurich Policy, supports the conclusion that the Zurich Policy is excess to the XL Policies. *Id.* at 13–14.

XL Specialty filed its reply on May 8, 2025. Dkt. No. 68 ("Reply"). XL Specialty reiterated its argument that the Zurich Policy was not written as "specific excess insurance" over the XL Policies because it did not make a "clear reference" to those policies. Reply at 3. XL Specialty argued that, under New York law, "general references are insufficient" to make one policy specifically excess over another. *Id.* at 3–4. Moreover, XL Specialty argued that because the Zurich Policy only negates contribution with policies that carry a duty to defend, under *LiMauro*, it cannot be excess to the XL Policies. *Id.* at 6–7. XL Specialty also contended that the relative sizes of the premiums should not have an impact on the analysis "where the risks covered by the two policies 'vary considerably.'" *Id.* at 8 (citing *United Nat'l Ins. Co. v. Lumbermens Mut. Cas. Co.*, No. 89 CIV. 3869, 1994 WL 259820, at *4 (S.D.N.Y. June 8, 1994), *aff'd*, 48 F.3d 1212 (2d Cir. 1994)). And here, XL Specialty argued, the risks did "vary considerably" because the insured entities were fundamentally different—Lehman, for example, was "a massive financial institution," whereas Starwood was "a joint venture managing a hotel in Morocco." *Id.* at 8–9.

## III.    LEGAL STANDARD

### A. Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In

deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of N.Y Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts "do not look beyond 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (ellipses and citation omitted). In addition to the well-pleaded facts in the complaint, the Court has also considered the Zurich Policy, the XL Lehman Policy, and the XL Alvarez Policy.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a

complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw

on its judicial experience and common sense." *Id.* at 679.

### B. Interpretation of Insurance Contracts Under New York Law[5]

"Under New York law, insurance policies are interpreted according to general rules of

contract interpretation." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012)

(footnote omitted). Accordingly, "an insurance contract is interpreted to give effect to the intent of

the parties as expressed in the clear language of the contract." *Parks Real Est. Purchasing Grp. v. St.*

*Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006). The "words and phrases [in a contract]

should be given their plain meaning, and the contract should be construed so as to give full meaning

and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195,

206 (2d Cir. 2005) (internal quotation marks and ellipsis omitted). "An ambiguity exists where the

terms of an insurance contract could suggest more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated agreement and

who is cognizant of the customs, practices, usages and terminology as generally understood in the

particular trade or business." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d

Cir. 2000) (internal quotation marks omitted). However, "[l]anguage whose meaning is otherwise

plain does not become ambiguous merely because the parties urge different interpretations in the

litigation." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

"If a court concludes a provision in an insurance contract is ambiguous, it may consider

extrinsic evidence to ascertain the parties' intent at the formation of the contract." *Olin*, 704 F.3d at

99. "If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of

---

[5] "The parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001) (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). The Court therefore applies New York law.

contract interpretation, including New York's rule of *contra proferentem*, according to which ambiguity should be resolved in favor of the insured." *Id.*

### C. The "Pecking Order" of Excess Insurance Policies Under New York Law

"Even insurance policies that claim to be excess can be placed in a 'pecking order' consistent with the nature of protection each competing policy confers." *WCHCC (Bermuda) Ltd. v. Granite State Ins. Co.*, 564 F. App'x 615, 616 (2d Cir. 2014) (summary order). "In [*Lumbermens Mut. Cas. Co. v. Allstate Ins. Co.*, 51 N.Y.2d 651 (1980)], the Court of Appeals of New York noted that there are three general types of excess insurance policies . . . ." *Id.* at 616–17. "The first *Lumbermens* category encompasses policies generally stating that they are excess to other sources of insurance. The second *Lumbermens* category encompasses policies stating that they are excess to other policies, but specifically addressing their interplay with other *excess* policies." *Id.* This case involves the second *Lumbermens* category, as the Court must determine the "pecking order" of the Zurich and XL Policies, which all contain "Other Insurance" provisions describing them as excess to other policies. New York law provides clear guidance for the Court in making that determination.

Under New York law, "where there are multiple policies covering the same risk, and each generally purports to be excess to the other, the excess coverage clauses are held to cancel out each other and each insurer contributes in proportion to its limit amount of insurance." *Lumbermens*, 51 N.Y.2d at 655. On the other hand, "an insurance policy which purports to be excess coverage but contemplates contribution with other excess policies or does not by the language used negate that possibility must contribute ratably with a similar policy, but must be exhausted before a policy which expressly negates contribution with other carriers, or otherwise manifests that it is intended to be excess over other excess policies." *LiMauro*, 65 N.Y.2d at 375–76. "[P]olicies do not cancel each other out simply because they both purport to be excess; the key consideration is whether they each 'purport[] to be excess to the other'  . . . ." *Hartford Underwriters Ins. Co. v. Hanover Ins. Co.*, 122

F. Supp. 3d 143, 152 (S.D.N.Y. 2015) (quoting *Lumbermens*, 51 N.Y.2d at 655), *aff'd*, 653 F. App'x 66 (2d Cir. 2016).

To make this determination, a court looks to "the plain language of each policy." *WCHCC*, 564 F. App'x at 616; *see also Kipper v. Universal Underwriters Grp.*, 756 N.Y.S.2d 682, 684 (4th Dep't 2003) (noting that a court should consider "the precise language of the limiting clauses in the policies" to evaluate insurer's contribution obligation). Also "[i]ndicative of such an intent, though not conclusive, may be the fact that a policy is issued as 'umbrella' or 'catastrophe' coverage, at rates which reflect the reduced risk insured." *LiMauro*, 65 N.Y.2d at 376.

## IV.    DISCUSSION

### A. The XL Policies Are Excess to the Zurich Policy

Each of the XL Policies "manifests that it is intended to be excess over other excess policies," while the Zurich Policy does not. *Id.* at 375–76. As such, the XL Policies are excess to the Zurich Policy. The "Other Insurance" provisions in the XL Lehman Policy and the XL Alvarez Policy both state the following:

> If any loss resulting from any Claim is insured under any other policy(ies), *this Policy shall apply only to the extent Loss exceeds the amount paid under such other valid and collectible insurance whether such other insurance is stated to be primary, excess, contingent or otherwise,* unless such other insurance is written only as specific excess insurance over this Policy in order to avoid duplication of payment of claims.

Lehman Other Insurance Provision (emphasis added); A&M Other Insurance Provision (emphasis added). The policy language expressly states that the XL Policies are to be excess to all other policies—even those designated as excess, "unless such other insurance is written only as specific excess insurance" over the policy.

The "Other Insurance" provisions of the XL Policies negate contribution. The XL Policies do not use the "magic words, that it 'shall [or will] not contribute'" with other insurance. *Hartford Underwriters*, 122 F. Supp. 3d at 154 n.6. However, the policy language "expresses as much an

intention to negate contribution," because it defines its loss relative to other excess insurance as only that amount in excess of that paid by other policies—including those designated as generally "excess." *See id.* (reaching same conclusion with respect to policy reading that "[w]hen this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of . . . the total amount that all such other insurance would pay for the loss in the absence of this insurance[,] and . . . [t]he total of all deductible and self-insured amounts under all that other insurance.").

If there were any doubt, Section VI(C)(2) of the XL Policies underscores that the policies negate contribution here, because this case involves a Lehman "Joint Venture":

> All coverage under this Policy for Loss from Claims made against the Insured Persons while acting in their capacity as a director, officer, trustee, regent or governor of a Non-Profit Entity or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the Insured Persons of the Company, regardless of the name or title by which such position is designated, *of a Joint Venture will be specifically excess of and will not contribute with, any other insurance or indemnification available to such Insured Person from such Non-Profit Entity or Joint Venture by reason of their service as such.*

XL Lehman Policy & XL Alvarez Policy, § VI(C)(2) (emphasis added).  The Court understands that the Zurich Policy qualifies, because it provides insurance to members of management of Woodland—a subsidiary of Lehman's joint venture, Starman Holdings.  Like the policy at issue in *LiMauro*, this language specifically negates contribution with policies provided by other carriers.  *See* 65 N.Y.2d at 377.[6]

The Zurich Policy is an excess policy, but it does not specifically "manifest[] that it is intended to be excess over other excess policies." *Id.* at 375–76.  In relevant part, the Zurich Policy states:

> If a Claim or Investigation under this Policy would, but for the existence of this Policy, be insured by any other valid and collectable:  (a) directors and officers liability or

---

[6]  In addition, the "Specified Other Insurance" endorsement to the XL Alvarez Policy expressly states that it is excess to all policies issued to its clients.  XL Alvarez Policy, Specified Other Insurance Endorsement, § 1.

> management liability policy or indemnity; (b) employment practices liability insurance policy; (c) general liability insurance policy; (d) pollution liability insurance policy; or (e) any other insurance which has a duty to defend such Claim or Investigation, the Insurer shall only be liable for any amount above that collectable under such other policy.

Zurich Policy Part 2, § 10.4. The policy simply does not state that it is excess over other excess policies.[7] Therefore, applying the *LiMauro* Rule, it must be exhausted before the XL Policies, which do.

Zurich's argument that the Zurich Policy was written "only as specific excess insurance" over the XL Policies has no merit. As described above, Zurich's argument is based on the text of the Lehman and A&M Other Insurance Provisions, which state that the policies do not contribute to other policies "unless such other insurance is written only as specific excess insurance over this Policy in order to avoid duplication of payment of claims." Lehman Other Insurance Provision; A&M Other Insurance Provision. If the Zurich Policy was "written only as specific excess insurance" over those policies, Zurich's policy would fall into that exclusion. But it does not.

The Zurich Policy was not written "only as specific excess insurance over" either XL Policy.

---

[7] In the absence of an express provision making the Zurich Policy excess to other excess policies, Zurich presents a strained backstop argument—that the XL Policies are other "valid and collectable" policies and that therefore Zurich is not liable "for any amount collectable under such other policy." Zurich argues that, because the XL Policies are management liability policies, pursuant to Section 10.4, Zurich should "only be liable for any amount above that collectable" under the XL Policies. Opp. at 16–17. However, the language in Section 10.4 of the Zurich Policy does not make the Zurich Policy excess to the XL Policies, for two principal reasons. First, unlike the XL Policies, the Zurich Policy does not state that it is intended to be excess to other *excess* policies. As the court stated in *Charter Oak Fire Insurance Co. v. HDI-Gerling America Insurance Co.*, where one policy "provides that it is excess over even other excess insurance," that "means that it is excess to the [other] [p]olicy even if the latter's Other Insurance endorsement means that it is generally excess to other primary policies." No. 24-CV-6322, 2025 WL 2606726, at *5 (S.D.N.Y. Sept. 8, 2025). In *Charter Oak*, the court found that Charter Oak's "Other Insurance" provision—which, like the XL Policies, explicitly stated that it was excess over "[a]ny of the other insurance, *whether primary, excess, contingent or on any other basis*"—was excess to another policy that did not explicitly state that it was excess over other excess policies. *Id.* at *4–5. Even if the Zurich Policy can be read to make itself excess over other management liability policies as a general matter, the XL Policies are explicit in their intent to make themselves excess to other *excess* policies—and courts find that policies with explicit language to this effect are excess over policies lacking such language. *See, e.g., id.* Second, "[i]n cases in which one insurance policy has a no liability clause and the other insurance policy has an excess clause, the general rule is that the no liability clause is not given effect." *Kipper*, 756 N.Y.S.2d at 684. "The rationale for the [general] rule is that the policy containing the excess clause does not constitute 'other available insurance' [here, referred to as other 'applicable' insurance] within the meaning of the [no liability] clause." *Id.* (citation omitted). Here, the XL Policies, which are excess to the Zurich Policy, are not "collectable" policies within the meaning of the Zurich Policy's other insurance provision.

A "reference in an insurance policy to insurance 'specifically purchased to apply in excess' of the subject policy (or similar phraseology) means a higher-level policy that specifically designates the subject policy as underlying insurance." *Bovis Lend Lease LMB, Inc. v. Great Am. Ins. Co.*, 855 N.Y.S.2d 459, 469 (1st Dep't 2008). The Zurich Policy does not specifically designate either XL Policy as underlying insurance. The Zurich Policy does not mention either policy at all. The Zurich Policy contains language stating that it is excess to other management insurance policies—but that is a general reference to a category of policies—not to the specific policies issued by XL Specialty. And nothing suggests that the Zurich Policy was written "only" as specific excess over the XL Policies.

The Zurich Policy must be exhausted before the XL Policies because the former does not negate contribution with the latter. The Zurich Policy does not negate the prospect of ratable contribution with the XL Policies. The first paragraph of Section 10.4 of the Zurich Policy does not expressly negate contribution.[8] By contrast, the second paragraph of Section 10.4 of the Zurich Policy does: "[w]hen any other insurer has acknowledged under a duty to defend any [c]laim or [i]nvestigation . . . [Zurich] shall not respond or contribute to . . . [d]efen[s]e costs." Zurich Policy Part 2. *Expressio Unius Est Exclusio Alterius*: the fact that the second paragraph contains express

---

[8] Zurich, likely recognizing that the second paragraph of Section 10.4 does not disclaim contribution with the XL Policies, argues instead that the first paragraph of that section, discussed above, negates contribution:

> If a Claim or Investigation under this Policy would, but for the existence of this Policy, be insured by any other valid and collectible: (a) directors and officers liability or management liability policy or indemnity . . . the Insurer shall only be liable for any amount above that collectable under such other policy.

Zurich Policy Part 2, § 10.4. Zurich argues that this language can be construed "as non-contributory, even though the clause [does] not expressly use the terms 'non-contributory' or 'will not contribute.'" Opp. at 16–17 (citing *Am. Transit Ins. Co. v. Cont'l Cas. Ins. Co.*, 625 N.Y.S.2d 653, 653 (2d Dep't 1995)). It is true that courts have found policies to negate contribution, even where they do not use those "magic words." *Hartford Underwriters*, 122 F. Supp. 3d at 154 n.6; *see also, e.g.*, *Am. Transit*, 625 N.Y.S.2d at 653. However, the policies in *American Transit* and *Hartford Underwriters* are unlike the Zurich Policy because they explicitly stated that they were excess over other *excess* policies. *See Hartford Underwriters*, 122 F. Supp. 3d at 150 (Hanover Policy stated that it was "excess over any other collectible insurance, whether primary, excess or contingent"); *Am. Transit*, 625 N.Y.S.2d at 653 (American Transit's policy stated, "[t]he insurance provided by this endorsement is excess over any other collectible insurance, whether primary, excess or contingent.").

language negating contribution supports the conclusion that the preceding paragraph, which omits

such language, does not. But, in any event, this provision is inapplicable, as XL Specialty has not

acknowledged a duty to defend. Compl. ¶ 33. Accordingly, the Zurich Policy does not negate

contribution with the XL Policies, and must be exhausted before they are required to contribute.

Because "the plain language of the policy is determinative" here, the Court need not rely on

the policies' stated coverage to ascertain the order of priority. *Fieldston Prop. Owners Ass'n, Inc. v.*

*Hermitage Ins. Co.*, 16 N.Y.3d 257, 264 (2011). However, because *LiMauro* notes that "the purpose

each policy was intended to serve," as evidenced by their "stated coverage and the premium paid for

[them]" may be instructive, the Court has considered that issue here. *See LiMauro*, 65 N.Y.2d at 374.

The structure of the policies and the premiums paid for them do not displace the result

dictated by the language of the policies. The Zurich Policy was issued to a company in the

corporate structure that is much closer to the underlying action than the XL Policies. The XL

Lehman Policy was a management liability policy "issued to a massive financial institution," and the

XL Alvarez Policy was issued to "a consulting firm servicing said . . . institution during bankruptcy,"

while the Zurich Policy was a directors and officers policy issued to Starman Holdings, "a joint

venture managing a hotel in Morocco." Reply at 9.

For the same reason, the premiums paid on the policies are not instructive here. Zurich

represents that "[i]n relative terms, the premium amount in the XL Lehman Policy is *72.96 times*

*greater* than the premium in the Zurich [P]olicy[,] and the premium amount in the XL [Alvarez]

Policy is *17.35 times greater* than the Zurich premium." Opp. at 12 (emphasis in original). But that

should not be surprising given that the XL Policies covered a broad array of risks related to all of

Lehman and A&M's businesses, not only Lehman's partial interest in a hospitality company. "[T]he

disparate premiums [Zurich] and [XL Specialty] received appear related to the policies' duration and

covered risks, rather than their level of coverage." *Certain Underwriters v. Ill. Nat'l Ins. Co.*, 99 F. Supp.

3d 400, 408 (S.D.N.Y. 2015). Considering the different risks covered by the Zurich Policy and the XL Policies, the premiums are not instructive as to their priority of coverage.

Because the XL Policies manifest that they are excess to other excess policies, while the Zurich Policy does not, the former is excess to the latter. Accordingly, XL Specialty's motion to dismiss the first and fourth counts of the amended complaint is granted.

### B. Plaintiff Has Not Stated A Claim For Unjust Enrichment

Zurich has not pleaded a claim for unjust enrichment against XL Specialty, because XL Specialty has not been unjustly enriched. "The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in equity and good conscience should be paid to the plaintiff." *McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 608 (2d Cir. 2024) (quoting *Corsello v. Verizon N.Y., Inc.*, 944 N.Y.S.2d 732, 740 (2012)). "[U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when . . . . the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Id.* (quoting *Corsello*, 944 N.Y.S.2d at 740). "To prove an unjust enrichment claim under New York law, '[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.'" *Eidelman v. Sun Prods. Corp.*, No. 21-1046-CV, 2022 WL 1929250, at *2 (2d Cir. June 6, 2022) (summary order) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011)) (alteration in original). Because XL Specialty has no obligation to contribute to the defense of the Moroccan Proceedings at this time, Plaintiff has not pleaded that XL Specialty has been unjustly enriched.[9]

---

[9] XL Specialty also argues that New York law does not recognize a cause of action for unjust enrichment in disputes between co-insurers as to their respective coverage obligations. This argument is well-supported. *See, e.g.*, *Nat'l Cas. Co. v. Vigilant Ins. Co.*, 466 F. Supp. 2d 533, 544 (S.D.N.Y. 2006) ("[T]his Court has found no cases that permit a claim between co-insurers under a theory of unjust enrichment."); *U.S. Fire Ins. Co v. Fed. Ins. Co.*, 858 F.2d 882, 888 (2d Cir. 1988) (noting that, in disputes regarding contribution between coinsurers, "the vehicle through which the court remedies

### C.  Plaintiff Has Not Stated a Claim for Equitable Subrogation

Zurich's claims against XL Specialty for equitable subrogation must also be dismissed because Zurich is not seeking indemnification from a third-party wrongdoer.  "Under New York law, the equitable doctrine of subrogation entitles an insurer to stand in the shoes of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." *ACE Am. Ins. Co. v. Am. Guarantee & Liab. Ins. Co.*, 257 F. Supp. 3d 596, 601 (S.D.N.Y. 2017) (internal quotation marks omitted).  However, Zurich's claim for contribution against XL Specialty "does not involve subrogation because the [plaintiff is] not seeking reimbursement from a third-party wrongdoer." *Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 211 (2d Cir. 2000).  Therefore, Zurich's claims for subrogation must be dismissed.  *See, e.g.*, *Nat'l Ins. Co.*, 466 F. Supp. 2d at 541–42; *see also Tech. Ins. Co.*, 642 F. Supp. 3d at 470 ("[C]laims for payment between co-insurers do not sound in subrogation . . . ."); *Danaher Corp. v. Travelers Indem. Co.*, No. 10 CIV. 121, 2014 WL 1133472, at *7 (S.D.N.Y. Mar. 21, 2014).

### V.     LEAVE TO AMEND

The Court denies Plaintiff leave to amend because an amendment would be futile.  "The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  The Court's ruling

---

unjust enrichment is quasi contract"); *Tech. Ins. Co. v. Phila. Indem. Ins. Co.*, 642 F. Supp. 3d 445, 468 (S.D.N.Y. 2022) ("New York courts have described claims for payment between co-insurers that are not proportional or ratable, and are based on coverage for the same insured, as arising under the theory of recovery of implied indemnification."); *Certain Underwriters at Lloyd's, London v. Allied Pros. Ins. Co.*, No. 22-CV-14, 2023 WL 4449570, at *5 (W.D.N.Y. July 11, 2023) (same).  Plaintiff finds little support for its position that the cause of action is available in this situation.  Zurich cites only one case recognizing a claim for unjust enrichment in an action between co-insurers, but that case applies California, not New York law.  *Starr Indem. & Liab. Co. v AGCS Marine Ins. Co.*, No. 20 CIV. 5321, 2021 WL 3005840, at *10 (S.D.N.Y. July 14, 2021).  The Court need not reach the question whether the cause of action is available at all in actions between co-insurers, for it is certainly not well pleaded on these facts.

here turns on its interpretation of the language of the policies, which cannot be changed.  Therefore, an amendment to cure the deficiencies in the pleading identified here would be futile.

## VI.    CONCLUSION

For the reasons stated above, XL Specialty's motion to dismiss is GRANTED.  Counts one through six are dismissed with prejudice.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 64.

Dated:  February 11, 2026
        New York, New York

                                                                                                                GREGORY H. WOODS
                                                              United States District Judge